# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————————

No. 13-60736

———————————————

JOSE MANUEL RODRIGUEZ-AVALOS,

United States Court of Appeals
Fifth Circuit

**FILED**

March 4, 2015

Lyle W. Cayce
Clerk

Petitioner

v.

ERIC H. HOLDER, JR., U.S. ATTORNEY GENERAL,

Respondent

———————————————

Petition for Review of an Order of the
Board of Immigration Appeals

———————————————

Before DAVIS, DENNIS, and COSTA, Circuit Judges.

PER CURIAM:

Jose Manuel Rodriguez-Avalos (Rodriguez) petitions this court for review of a Board of Immigration Appeals (BIA) decision. The BIA dismissed his appeal from the Immigration Judge's denial of his application for relief from removal. The BIA, like the Immigration Judge, held that the prison sentence Rodriguez served following his conviction for falsely and willfully representing himself as a United States citizen, in violation of 18 U.S.C. § 911, barred him from demonstrating the "good moral character" necessary to be statutorily eligible for relief from removal pursuant to 8 U.S.C. § 1229b(b)(1). For the following reasons, we DENY Rodriguez's petition for review.

No. 13-60736

## I.

Rodriguez is a citizen of Mexico who entered the United States without having been admitted or paroled. In January 2011, a Department of Homeland Security (DHS) inspection revealed that Rodriguez was one of fourteen employees of an Omaha, Nebraska grocery store against whom identity-theft complaints had been filed with the Federal Trade Commission. On May 3, 2011, a DHS agent interviewed Rodriguez, who admitted his identity to the DHS agent and admitted that he had no documentation allowing him to enter or work in the United States.[1] Rodriguez was then placed under arrest for administrative immigration violations.

Based on the DHS investigation, Rodriguez was indicted on May 18, 2011, and charged with, *inter alia*, falsely and willfully representing himself to be a United States citizen in violation of 18 U.S.C. § 911. On October 11, 2011, in the United States District Court of Nebraska, Rodriguez pleaded guilty to having committed a § 911 offense. He was sentenced on January 18, 2012 to fourteen months of imprisonment. Rodriguez later testified during immigration proceedings that he served "about seven" months of his sentence before being released.[2]

On November 28, 2012, the DHS served Rodriguez with a notice to appear (NTA), charging him with removability under 8 U.S.C. § 1182(a)(6)(A)(i) as an alien who had entered the United States without having been admitted or paroled. On April 29, 2013, Rodriguez appeared with

---

[1] During these interviews, Rodriguez did not specify when he entered the United States, but later, in his written pleading to the immigration judge, he asserted that he had entered the United States in April 1999.

[2] There is no record evidence regarding the specific dates during which Rodriguez was confined. However, he does not contest the Immigration Judge's and the BIA's characterization of his sentence as "at least six months" and "approximately seven months," respectively.

counsel before an immigration judge (IJ), and submitted written pleadings admitting the allegations against him and conceding the charges of removability. His pleadings included an application for cancellation of removal pursuant to 8 U.S.C. § 1229b(b)(1),[3] asserting that his removal to Mexico would result in hardship to his three United States citizen children.[4] The IJ entered an oral order sustaining the charge of removability and denying Rodriguez's application for cancellation of removal, finding that pursuant to 8 U.S.C. § 1101(f)(7),[5] because Rodriguez spent "at least the last six months in custody for a conviction," he could not demonstrate the statutorily required good moral character. The IJ ordered Rodriguez removed to Mexico.

Rodriguez appealed to the BIA. The BIA, in a single-judge opinion, agreed with the IJ's determination that Rodriguez's service of approximately

---

[3] Section 1229b(b)(1) provides in relevant part that:

[T]he Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien—

　(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application;

　(B) has been a person of good moral character during such period;

　(C) has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title, subject to paragraph (5); and

　(D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

[4] The record reflects that Rodriguez was married in 2004 in Omaha, Nebraska, and thereafter had three children with his wife, all of whom were born in Omaha.

[5] Section 1101(f) provides a list of various conditions that preclude a petitioner from establishing the good moral character necessary to be eligible for cancellation of removal, such as "confine[ment], as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period[.]" 8 U.S.C. § 1101(f)(7).

No. 13-60736

seven months following his § 911 conviction precluded him from establishing the "good moral character" required for cancellation of removal, and dismissed Rodriguez's appeal. *See* § 1229b(b)(1)(B). Rodriguez filed a timely petition for review. In November 2013, this court granted Rodriguez's unopposed motion for a stay of deportation and we now consider his petition for review.

Rodriguez contends that his § 911 conviction for falsely claiming to be a United States citizen is not a crime involving moral turpitude and thus his seven-month incarceration as a result of that conviction should not preclude him from establishing the good moral character necessary to be eligible for cancellation of removal under § 1229b(b)(1). He additionally argues that his prison term fell outside of the relevant time period for demonstrating good moral character because the so-called "stop-time" rule, codified at § 1229b(d)(1),[6] operates to end the ten-year good moral character period when an NTA is served upon the petitioner. Despite stating in his petition for review that the NTA was "formally issued" on November 28, 2012, Rodriguez argues that the Government should be estopped from asserting that the date the NTA was served was anything other than May 3, 2011—the date that appears on a DHS form as the date he was served with an NTA and placed into removal proceedings. Therefore, Rodriguez argues, the relevant time period for establishing good moral character is the ten years immediately *preceding* May 3, 2011 and, because his prison sentence was served *after* May 3, 2011, he is statutorily eligible for cancellation of removal.

Primarily at issue before us are questions of statutory interpretation of various provisions of the Immigration and Nationality Act ("INA"). First,

---

[6] *See* 8 U.S.C. § 1229b(d)(1) ("For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear . . .").

No. 13-60736

whether 8 U.S.C. § 1101(f)(7) precludes a petitioner from demonstrating good moral character if he or she has been confined to a penal institution for 180 days or more, even if such a confinement was a result of a crime that is not a crime involving moral turpitude.    Second, whether § 1229b(b)(1) and § 1229b(d)(1) together signify that the time period for establishing good moral character for purposes of cancellation of removal is the ten years preceding the final administrative decision of the IJ or BIA, or, rather, whether it is measured ten years backwards from the date the petitioner was served with the NTA.

## II.

Generally, we review the "BIA's legal conclusions *de novo* 'unless a conclusion embodies the [BIA's] interpretation of an ambiguous provision of a statute that it administers; a conclusion of the latter type is entitled to the deference prescribed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council.*'"[7]  *See Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012) (quoting *Singh v. Gonzales*, 436 F.3d 484, 487 (5th Cir. 2006)).  As we have recently explained, however, we only apply *Chevron* deference to the BIA's interpretation of the statutes and regulations it administers when its interpretations are precedential and thus "carry[] the force of law."  *Dhuka v. Holder*, 716 F.3d 149, 155 (5th Cir. 2013) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  If we determine that the BIA decision is precedential,[8] then we proceed under the *Chevron* two-part inquiry:

> [W]hen reviewing an agency's construction of a statute it administers, a court must determine first whether Congress has

---

[7] 467 U.S. 837 (1984).

[8] In *Dhuka* we reasoned that a three-member panel opinion, unless it is designated to serve as one of the "'precedents in all proceedings involving the same issues or issues,'" is not precedential and not entitled to *Chevron* deference.  *Dhuka*, 716 F.3d at 156 (quoting 8 C.F.R. § 1003.1(g)).

directly spoken to the question at issue.  If so, the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If not, the court must determine whether the agency's answer is based on a permissible construction of the statute. . . .  Courts give agency interpretations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."

*Orellana-Monson*, 685 F.3d at 517 (quoting *Chevron*, 467 U.S. at 842-44) (internal citations omitted).

Comparatively, when examining a non-precedential BIA decision, we use the standard announced in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See Dhuka*, 716 F.3d at 156.  "Under [the *Skidmore*] standard, the 'weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'"  *Id.* at 154 (quoting *Skidmore*, 323 U.S. at 140).  Single-judge decisions of the BIA and unpublished opinions issued by three-member panels of the BIA are "non-precedential [and therefore] do[] not . . . bind third parties and [are] not entitled to *Chevron* deference . . . [but] will be examined closely for [their] power to persuade."  *Id.* at 156; *see also Rodriguez-Benitez v. Holder*, 763 F.3d 404, 406 (5th Cir. 2014) ("Where . . . the statute is silent or ambiguous with respect to the specific issue, but the three-member Board panel did not publish its order . . . or otherwise cite to precedential authority, this Court affords only *Skidmore* deference to the panel's interpretation") (footnote and quotation marks omitted).  Nonetheless, to the extent a non-precedential BIA decision "relies on prior precedential BIA decisions," it is reviewed under the deferential *Chevron* two-part inquiry, "as appropriate."  *Siwe v. Holder*, 742 F.3d 603, 607 (5th Cir. 2014).

No. 13-60736

For the reasons that follow, we hold that (1) applying the *Skidmore* standard, the BIA did not err in concluding that a petitioner cannot establish good moral character if he has been incarcerated for 180 days or more, regardless of the nature of the underlying crime of conviction; and (2) the BIA's interpretation of Section 1229b(b)(1) as requiring a petitioner to establish good moral character during the ten-years immediately preceding the final administrative decision regarding the petitioner's application for cancellation of removal is entitled to deference under *Chevron.* Because we uphold the BIA's decision regarding Rodriguez's statutory ineligibility for cancellation of removal, his estoppel argument regarding the date of service of the NTA is rendered moot.

**A.**

Section 1229b(b)(1) provides for cancellation of removal if the petitioner meets various eligibility requirements, including, *inter alia*, that the petitioner "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application[,]" and (2) "has been a person of good moral character [hereinafter "GMC"] during such period[.]"  8 U.S.C. § 1229b(b)(1).  An individual is precluded from establishing GMC if, during the pertinent time period, he has "been confined, as a result of conviction, to a penal institution for an aggregate period of [180] days or more[.]"  *See* 8 U.S.C. § 1101(f)(7).  Section 1101(f) states in relevant part that:

> No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was--
>  . . .
>  (7) . . . confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more,

No. 13-60736

regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period[.]

8 U.S.C. § 1101(f)(7).

Rodriguez challenges the BIA's determination that, by virtue of his seven-month incarceration, he was precluded by § 1101(f)(7) from showing that he was a person of GMC. Rodriguez contends that his crime of conviction, 18 U.S.C. § 911, falsely and willfully representing himself as a United States citizen, is not categorically a crime involving moral turpitude (CIMT), and thus should not foreclose his ability to establish the GMC necessary for cancellation of removal. He argues that it is illogical and unreasonable to foreclose the possibility of cancellation of removal based solely upon the length of time one spends in jail, rather than the nature of the crime involved, and preclude a finding of GMC without consideration of whether the petitioner's underlying conduct was "base, vile, or depraved." *See generally Hyder v. Keisler*, 506 F.3d 388, 391 (5th Cir. 2007) (noting that we have adopted the BIA's definition of "moral turpitude" as "conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality . . . " (quoting *Hamdan v. I.N.S.*, 98 F.3d 183, 186 (5th Cir. 1996))).

Because the BIA's interpretation of § 1101(f)(7) was rendered by a single-judge, non-precedential opinion, and the judge did not cite any binding BIA precedent to draw its conclusion that § 1101(f)(7) applies regardless of the nature of the underlying conviction, we apply the *Skidmore* standard of review. *See Dhuka*, 716 F.3d at 156. To determine the "weight" the BIA's judgment will be given we will consider the reasonableness of the BIA's interpretation of § 1101(f)(7), prior relevant BIA decisions, this court's non-binding precedent, and the persuasive authority from our sister circuits. *Id.* at 154 (citing *Skidmore*, 323 U.S. at 140).

First, the BIA's interpretation of § 1101(f)(7) is a reasonable, logical reading of the statute's text.  Here, the BIA explained that the plain text of § 1101(f)(7) does not contain any language that limits the confinement as a "result of conviction" to confinement as a result of conviction of *crimes involving moral turpitude*, and the BIA refused to construe the statute to have this limiting effect.  Further, the sub-sections of § 1229b(b)(1) distinguish between a demonstration of GMC and the absence of a conviction of a CIMT. *See* § 1229b(b)(1)(B) & (C).[9]  In order to be eligible for cancellation of removal under § 1229b(b)(1), a petitioner must establish *both* GMC during the requisite time period *and* that he or she was not convicted of a CIMT.  If the IJ finds *either* a conviction of a CIMT, or a lack of GMC, then the petitioner is ineligible for discretionary cancellation of removal.  Were we to accept Rodriguez's argument that only those who serve over 180 days in confinement as a result of conviction of a CIMT are precluded from demonstrating GMC, then the separate GMC provision codified at § 1229b(b)(1)(B) would be rendered superfluous.

Moreover, the BIA's prior precedent suggests that to limit the application of § 1101(f)(7) to confinement as a result of crimes involving moral

---

[9] As noted, the statute states, in relevant part:

Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien--(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; (B) has been a person of *good moral character* during such period; (C) has *not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3)* of this title, subject to paragraph (5).

8 U.S.C.A. § 1229b(1)(B)-(C) (emphases added).  The statutes cited in sub-section (C) reference, *inter alia*, conviction for crimes involving moral turpitude. *See* § 1182(a)(2)(i); § 1227(a)(2).

No. 13-60736

turpitude would be inconsistent with Congressional intent.  As the BIA has explained, "the guiding philosophy behind the promulgation of the section undoubtedly was that a person who has served a jail term of a specified length is not worthy for special exemptions from the penalties of the immigration laws." *Matter of B-----*, 7 I. & N. Dec. 405, 406 (BIA 1957).  The BIA has therefore shown hesitancy in reading limitations into § 1101(f)(7) without express direction from Congress.  *See, e.g.*, *Matter of Piroglu*, 17 I. & N. Dec. 578, 580 (BIA 1980) ("The language of the statute is clear that confinement for the prescribed period resulting from a conviction bars a finding of good moral character.  It makes no exception for a prison term resulting from violation of probation rather than from an original sentence to incarceration. Absent a showing that Congress intended to make such a distinction, we are unwilling to so limit the statutory mandate that persons within its scope should be barred from establishing good moral character.") (footnote omitted).

Further, the precedent in this circuit is consistent with the BIA's interpretation of § 1101(f)(7) as foreclosing Rodriguez's ability to establish GMC based on his recent incarceration, regardless of the nature of the underlying conviction.  A panel of this court, in an unpublished opinion, has indicated that a petitioner's ineligibility for cancellation of removal based on a period of confinement in excess of 180 days does not turn on whether the crime of conviction was a CIMT.  *See Pacheco v. Holder*, 544 F. App'x 442, 443 (5th Cir. 2013) (unpublished) ("Pacheco admitted to serving over four years in prison; thus, she was statutorily ineligible for cancellation of removal because she could not demonstrate the requisite good moral character, *regardless of whether she was convicted of a crime involving moral turpitude*.") (emphasis added).  The *Pacheco* panel cites *Eyoum v. INS*, in which we concluded that a

10

No. 13-60736

petitioner was ineligible for voluntary departure[10] because, pursuant to § 1101(f)(7), he could not establish GMC for the requisite period because he was imprisoned for ten months following conviction for importation of pancake turtles—a crime that the BIA determined is *not* a CIMT. 125 F.3d 889, 891 & n.2 (5th Cir. 1997). Thus, while there is no binding precedent specifically addressing whether a petitioner seeking *cancellation of removal* is ineligible for such relief because he or she spent 180 days or more in confinement as a result of a crime that is not characterized as a CIMT, we have interpreted § 1101(f)(7) as precluding a petitioner's eligibility for *voluntary departure* where the petitioner has been confined in excess of 180 days, regardless of whether the confinement resulted from conviction for a CIMT. As such, the BIA's interpretation of § 1101(f)(7) is consistent with our "earlier and later pronouncements" of the statute's operation. *See Skidmore*, 323 U.S. at 140.

The Ninth Circuit has similarly endorsed the BIA's interpretation of § 1101(f)(7) as precluding cancellation of removal or voluntary departure based upon 180 days or more of confinement, regardless of the nature of the underlying offense for which the petitioner is confined. In an unpublished decision, the Ninth Circuit reasoned that because the record suggested that a petitioner spent over 180 days in prison for his conviction, "even if [the

---

[10] Section 1229c(b)(1) provides that a petitioner may be granted voluntary departure in lieu of removal if the immigration judge finds that:

(A) the alien has been physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served under section 1229(a) of this title;

(B) the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure;

(C) the alien is not deportable under section 1227(a)(2)(A)(iii) or section 1227(a)(4) of this title; and

(D) the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so.

11

petitioner can establish that] his conviction was not for a crime involving moral turpitude, he would still be ineligible for" cancellation of removal or voluntary departure.  *Castro v. Holder*, 467 F. App'x 689, 691 (9th Cir. 2012) (unpublished) (remanding to allow the IJ to determine in the first instance whether petitioner would have been ineligible for cancellation of removal based on the time he served in prison).  *See also Arreguin-Moreno v. Mukasey*, 511 F.3d 1229, 1233 (9th Cir. 2008) (concluding, without finding it necessary to address whether the crime of conviction was a CIMT, that "the IJ correctly determined that the petitioner was not eligible for cancellation of removal because she served 180 days or more in a penal institution during the relevant period and was thus unable to satisfy the statutory good moral character requirement").  The Third Circuit has also recently explained, in dicta, that, "[e]ven if we conclude that [the petitioner's] crime was not categorically a crime involving moral turpitude, he would likely be ineligible for cancellation of removal under the 'person of good moral character' requirement."  *Mayorga v. Attorney Gen. U.S.*, 757 F.3d 126, 130 n.5 (3d Cir. 2014) (citing, *inter alia*, 8 U.S.C. § 1101(f)(7)).

In sum, the BIA's interpretation of § 1101(f)(7) is consistent with the plain text of the statute, the BIA precedent interpreting the Congressional intent of the statute, our non-binding precedent, and the persuasive authority from our sister-circuits.  We therefore hold that the BIA did not err in finding that Rodriguez is statutorily ineligible for cancellation of removal based on his incarceration in excess of 180 days as a result of conviction, pursuant to § 1101(f)(7), regardless of whether his conviction is not categorically a crime involving moral turpitude.[11]

---

[11] Further, although Rodriguez does not frame his challenges to the BIA's interpretation of § 1101(f)(7) as violative of the Constitution, we note that the Ninth Circuit

No. 13-60736

**B.**

Next, Rodriguez contends that, pursuant to the language contained in the "stop-time" rule, codified at 8 U.S.C. § 1229b(d)(1), the ten-year period during which he must establish GMC is measured backward from the date he was served with the NTA. Rodriguez acknowledges that the BIA has previously held in *Ortega-Cabrera*, 23 I. & N. Dec. 793, 798 (BIA 2005), that the pertinent GMC period consists of the ten years immediately preceding the final administrative decision by the IJ or the BIA, not the ten years preceding service of the NTA, but he argues that *Ortega-Cabrera* should be reconsidered. Specifically, Rodriguez contends that § 1229b(b) is unambiguous and requires that the ten-year GMC period mirror the period for continuous physical presence, and thus, pursuant to § 1229b(d)(1), both time periods must terminate upon the service of the NTA. We disagree and conclude that the BIA's decision here, which applied *Ortega-Cabrera*—a precedential three-judge opinion interpreting an ambiguous provision of the INA—is reasonable, and thus must be deferred to by this court.

Preliminarily, because the BIA relied upon *Ortega-Cabrera* in holding that the relevant time period for establishing GMC is the ten years immediately preceding the final administrative decision regarding Rodriguez's

recently rejected an equal protection and a substantive due process challenge to § 1101(f)(7) that was based on arguments similar to those made here by Rodriguez. *See Romero-Ochoa v. Holder*, 712 F.3d 1328, 1330-32 (9th Cir. 2013). Akin to Rodriguez's arguments about the "illogical" nature of § 1101(f)(7), the petitioner in *Romero-Ochoa* argued that § 1101(f)(7) unconstitutionally "presumes an individual to lack good moral character based solely on the length of time served in prison, rather than on the nature of the underlying criminal conduct. Given the wide variation in sentences imposed by different States for the same criminal conduct, Mr. Romero argues, § 1101(f)(7) allows disparate treatment of similarly situated individuals in violation of equal protection principles." *Id.* at 1330. Explaining that the statute is subject only to rational basis review, the Ninth Circuit upheld the statute, finding that Congress "rationally concluded that, in most cases, aliens who have been convicted of crimes serious enough to warrant at least six months of incarceration will lack the good moral character necessary to warrant discretionary relief from removal." *Id.* at 1331.

application for cancellation of removal, we apply the *Chevron* two-part inquiry to our review of this issue.  First, we agree with the BIA and the Seventh Circuit that the "interplay of the statutory language" at issue here is ambiguous and subject to multiple possible interpretations.  *See Duron-Ortiz*, 698 F.3d 523, 527 (7th Cir. 2012); *see also Ortega-Cabrera*, 23 I. & N. at 795.  Thus, under *Chevron* we must inquire only whether the BIA's interpretation in *Ortega-Cabrera* was permissible and not "arbitrary, capricious, or manifestly contrary to the statute."  *Siwe*, 742 F.3d at 608, n.27.

As noted *supra*, for a petitioner to establish eligibility for cancellation of removal, a petitioner must demonstrate, in relevant part, that he or she:

> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; and (B) has been a person of good moral character *during such period*[.]

8 U.S.C. § 1229b(b)(1)(A)-(B) (emphasis added).  In 1996, when Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), it added the "stop-time rule" to the INA, codified at 8 U.S.C. § 1229b(d)(1), providing that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear."  8 U.S.C. § 1229b(d)(1).  Prior to the passage of the stop-time rule, the BIA "consistently treated the continuous physical presence period, and consequently the good moral character period, as continuing to accrue through the time that we decided an alien's appeal," thereby requiring that a petitioner establish good moral character for ten years measured backwards from the final administrative resolution of a petitioner's application for cancellation of removal.  *Ortega-Cabrera*, 23 I. & N. Dec. at 794-95.  Subsequent to the passage of the stop-time rule, however, the BIA and federal courts have "universally established" that the ten-year period of

*continuous physical presence* stops for purposes of eligibility for cancellation of removal upon service of the NTA. *Id.* at 795.

In *Ortega-Cabrera*, the BIA analyzed the interplay between § 1229b(b) and § 1101(f) and interpreted § 1229b(b)(1)(B) such that the ten-year GMC period is terminated by the entry of a final administrative decision by the IJ or the BIA and thus the stop-time rule applies only to the continuous physical presence requirement. The BIA reasoned that despite the clarity of the stop-time rule in § 1229b(d)(1), the provision in § 1229b(b) regarding GMC is ambiguous as to when the ten-year period terminates, and is subject to three possible interpretations:

> First, the applicable period may be the 10-year period coterminous with that used to determine the length of continuous physical presence, which is bounded at the end by service of the charging document [the NTA]. Second, it may be the 10-year period ending on the date that the application for cancellation of removal is first filed with the court. Third, the period may be gauged by looking backward 10 years from the time a final administrative decision is rendered; that is, consistent with our long-established practice, the application would be treated as continuing beyond the date it is filed until a resolution by an Immigration Judge or the Board of Immigration Appeals is completed.

*Id.* at 795. The BIA concluded that the third interpretation best reflects congressional intent and that the "relevant period for determining good moral character for purposes establishing eligibility for cancellation of removal must include the time during which the respondent is in proceedings, i.e., until the issuance of an administratively final decision on the application." *Id.* at 797. The BIA reasoned that if the ten-year period of GMC were deemed to end upon service of the NTA, then an IJ would be foreclosed from considering, for example, a petitioner's false testimony proffered during his or her removal proceeding, yet Congress expressly indicates that such false testimony should preclude a finding of GMC. *See id.* at 796-97; 8 U.S.C. § 1101(f)(6) (barring a

petitioner from establishing GMC if he or she "has given false testimony for the purpose of obtaining any benefits under this chapter").

The issue of when § 1229b(b)(1)(B)'s ten-year GMC period terminates has never been directly addressed by this court. However, the BIA has reaffirmed its holding in *Ortega-Cabrera* in precedential opinions on at least two occasions. *See In re Garcia*, 24 I. & N. Dec. 179, 181 (BIA 2007); *In re Bautista Gomez*, 23 I. & N. Dec. 893, 894 (BIA 2006) ("We have recently reiterated the view that an application for relief from removal is a continuing one, holding that good moral character for cancellation of removal purposes continues to accrue up to the time we decide an alien's appeal").

Recently, the Seventh Circuit, deferring to the BIA's decision in *Ortega-Cabrera*, rejected arguments identical to those raised here by Rodriguez. *See Duron-Ortiz v. Holder*, 698 F.3d 523, 526-28 (7th Cir. 2012). In *Duron-Ortiz*, the Seventh Circuit persuasively reasoned that the BIA's interpretation of § 1229b(b)(1) as continuing the period of GMC until the final administrative decision of a petitioner's application for cancellation of removal is "logical [in] that [it allows] the agency [to] consider an applicant's most recent negative behavior when making such a decision, as the more recent an individual's behavior is, the more accurately it reflects his or her character." *Id.* at 528.

Additionally, the Third Circuit has impliedly approved of the *Ortega-Cabrera* rule by citing the Seventh Circuit's *Duron-Ortiz* case and noting that "the period for determining good moral character is a ten-year period calculated backwards *from the date on which a final administrative decision is issued.*" *Jaimez-Perez v. Attorney Gen. of U.S.*, 563 F. App'x 136, 137, n.1 (3d Cir. 2014) (unpublished) (emphasis added). The Ninth Circuit has likewise implicitly adopted the holding of *Ortega-Cabrera*. *See Castillo-Cruz v. Holder*, 581 F.3d 1154, 1162 (9th Cir. 2009) (citing *Ortega-Cabrera* to conclude that

because the petitioner was convicted before the "ten year period . . . calculated backwards from the date on which the cancellation of removal application is finally resolved by the IJ or the BIA," the petitioner's conviction did not bar him from establishing GMC).

Consistent with the persuasive reasoning of the Seventh Circuit in *Duron-Ortiz*, we defer to the BIA's reasonable interpretation of this ambiguous provision of the statutes it administers, as announced in *Ortega-Cabrera*, that the period for establishing GMC is the ten years immediately preceding the final administrative ruling regarding a petitioner's application for cancellation of removal. The BIA's interpretation of these provisions was "based on a permissible construction of the statute," it is not "arbitrary or capricious," and thus is entitled to deference. *See Chevron*, 467 U.S. at 843.

Rodriguez's textual argument that the statute *unambiguously* requires the GMC period to coincide with the continuous physical presence period—and thus that the period is calculated backwards from the date upon which the NTA is served—is unsupported by any persuasive authority and is inconsistent with the precedent discussed directly above. His policy-driven argument is likewise unavailing. Specifically, Rodriguez argues that the rule announced in *Ortega-Cabrera* will allow for "arbitrary outcomes capable of encouraging appellate system abuse," because a petitioner could attempt to manipulate and extend the proceedings to render a not-quite-ten-year-old period of confinement outside the bounds of the ten-year GMC period. As the Seventh Circuit has explained, however, the holding in *Ortega-Cabrera* logically allows judges to consider the most recent behavior of the applicant, and thus is the more reasonable calculation for the ten-year period, as opposed to ending the ten-year period upon service of the NTA, thereby allowing for the IJ's consideration of more distant, and therefore less relevant, periods of

17

incarceration. Under Rodriguez's interpretation, an individual served with an NTA today, with a nine-and-a-half year old period of confinement that exceeded 180 days, could not establish GMC, but a petitioner who is served with an NTA today and next week is imprisoned for 180 days or more for recent unlawful conduct, could demonstrate GMC, so long as he was fortuitously served with the NTA prior to the date he begins his term of imprisonment and meets the other statutory requirements.

Because we find the BIA's interpretation of § 1229b(b)(1) reasonable, and not arbitrary or capricious, we defer to the holding in *Ortega-Cabrera* and the BIA's decision here consistent with it. Therefore, we find no error in the BIA's holding that the ten-year GMC period would have ended, at the earliest, with the entry of the IJ's April 2013 order of removal. *See Ortega-Cabrera*, 23 I. & N. Dec. at 798. Rodriguez pleaded guilty to falsely claiming United States citizenship under § 911 in October 2011 and was sentenced to fourteen months imprisonment in January 2012. Rodriguez's seven-month incarceration, that occurred some time between January 2012 and when he appeared before the IJ for his removal proceedings in 2013, necessarily falls within the ten years preceding the final administrative decision regarding his application for cancellation of removal, thereby precluding him from establishing the GMC necessary for cancellation of removal. *See* § 1101(f)(7). Because we conclude that the BIA and IJ reasonably calculated the ten-year GMC period as the ten years preceding final adjudication of Rodriguez's claim, and not the ten years preceding service of the NTA, the date upon which the NTA was served is inapposite in this case, and we therefore agree with the BIA that Rodriguez's estoppel argument is moot and need not be addressed.

No. 13-60736

## CONCLUSION

Applying *Skidmore* deference, we hold that the BIA persuasively and reasonably found that Rodriguez's approximately seven-month incarceration during the ten years prior to the adjudication of his application for relief from removal foreclosed him from establishing good moral character, regardless of whether his conviction was for a crime involving moral turpitude. Additionally, we defer to the BIA's conclusion, consistent with its prior binding precedent, that the ten-year period during which a petitioner must establish good moral character for purposes of cancellation of removal is measured backward from the date of the final administrative decision regarding the petitioner's application for cancellation of removal. We therefore reject Rodriguez's challenges to the BIA's decision and DENY his petition for review.