**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2901
_____

PABLO ANTONIO MEJIA-CASTANON,
                                                  Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the Board of
Immigration Appeals
(Agency Case No. A206-033-430)
Immigration Judge: Honorable Steven A. Morley

_____

Argued: May 30, 2018

Before: AMBRO, SCIRICA, and SILER, JR.⬩,
*Circuit Judges*.

_____

⬩ Honorable Eugene E. Siler, Jr., United States Court of
Appeals for the Sixth Circuit, sitting by designation.

(Opinion Filed: July 25, 2019)

Theodore J. Murphy **[ARGUED]**
Murphy Law Firm
320 North High Street
West Chester, PA 19380
        *Counsel for Petitioner*

Chad A. Readler
Anthony P. Nicastro
Dana M. Camilleri
Sabatino F. Leo **[ARGUED]**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

————————————

OPINION OF THE COURT

————————————

SCIRICA, *Circuit Judge*

Aliens who are unlawfully present in the United States and ordered removed may apply for cancellation of that removal if they, among other things, have maintained a continuous physical presence in the United States for at least ten years and have been a person of good moral character for such period. Congress modified the calculation of the physical presence requirement when it amended the Immigration and

2

Nationality Act in 1996: Under the "stop-time rule," the physical presence period ends when the Department of Homeland Security serves the alien with a notice to appear.[1] As a result, aliens cannot continue to accrue physical presence time during the pendency of (often lengthy) removal proceedings and appeals. At issue is whether the stop-time rule applies to the time period during which an alien must exhibit good moral character.

Petitioner Pablo Antonio Mejia-Castanon maintains that it does, such that events occurring after the service of a notice to appear cannot be used to evaluate his good moral character. This time distinction is critical to Petitioner's application for cancellation of removal because he admitted to helping family members illegally enter the United States during the pendency of his application, a transgression that indisputably undermines his ability to demonstrate good moral character. Under Petitioner's interpretation, the stop-time rule operates to exclude these events from the evaluation of his moral character. But if the stop-time rule does not truncate the good moral character window, he will not satisfy the good moral character requirement and will be statutorily ineligible for cancellation of removal.

The Board of Immigration Appeals rejected Petitioner's reading of the statute, and two courts of appeals have deferred to the Board's interpretation under *Chevron*. For

---

[1]    While this case was pending, the Supreme Court issued a decision clarifying what is required of such a notice to appear. *See Pereira v. Sessions*, 138 S. Ct. 2105 (2018). *Pereira* has important consequences for the stop-time rule, which we discuss below. *See infra* Section I.B.2.

the reasons that follow, we agree with our sister circuits and hold that the Board's interpretation is entitled to *Chevron* deference. Under that interpretation, the stop-time rule does not apply to the good moral character requirement. Instead, the relevant time period on which to evaluate an alien's good moral character is the ten-year period prior to the final administrative decision on an alien's application for cancellation of removal. We will deny the petition.

## I.

Under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, an alien who enters the United States without permission, and who is not admitted or paroled, is removable. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(A). The Department of Homeland Security may remove such an alien by initiating removal proceedings before an Immigration Judge, *see id.* § 1229a, and providing written notice to the alien by serving him with a "notice to appear," *id.* § 1229(a)(1). The notice to appear informs the alien, among other things, of the "time and place" of the removal hearing, the "legal authority under which the proceedings are conducted," and the "charges against the alien." *Id.* § 1229(a)(1)(G)(i), (B), (D). An alien served with a notice to appear may challenge his removal on the merits or admit his removability while seeking certain discretionary relief.

## A.

Prior to amendments in 1996, one type of discretionary relief an alien could seek was suspension of deportation. The INA provided that "the Attorney General may, in his discretion, suspend deportation" of an alien if he (1) had "been

4

physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application;" (2) "prove[d] that during all of such period he was and is a person of good moral character;" and (3) was "a person whose deportation would . . . result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1254(a)(1) (1994); *see also I.N.S. v. Chadha*, 462 U.S. 919, 923–24 (1983). "Even if these prerequisites [we]re satisfied," however, "it remain[ed] in the discretion of the Attorney General to suspend, or refuse to suspend, deportation." *I.N.S. v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (citations omitted).

Under this pre-1996 formulation, the Board of Immigration Appeals interpreted the physical presence and good moral character time periods to be identical. *See In re Ortega-Cabrera*, 23 I. & N. Dec. 793, 794 (B.I.A. 2005) (citations omitted). And because the Board construed "such application" in the phrase "immediately preceding the date of such application," 8 U.S.C. § 1254(a)(1) (1994), to be "a continuing one," the seven-year time period for both "continu[ed] to accrue" through the Board's final administrative decision on an alien's application for cancellation of removal. *Ortega-Cabrera*, 23 I. & N. Dec. at 794. In other words, an alien could accrue the required seven years of physical presence during the pendency of her removal proceedings and appeals, and her moral character would also be evaluated until the final adjudication of her application.

This statutory structure was problematic, however, because it created a "substantial incentive" for those aliens facing deportation "to prolong litigation" and to "stall[ ]

physical departure in the hope of eventually satisfying" the seven-year requirement. *Rios-Pineda*, 471 U.S. at 450. Congress believed suspension of deportation was being abused and exploited, particularly by aliens seeking to "accrue time toward the seven year threshold even after they ha[d] been placed in deportation proceedings." H.R. Rep. 104-469, at 122 (1996); *see also In re Cisneros*, 23 I. & N. Dec. 668, 670 (B.I.A. 2004) ("[A]liens in deportation proceedings had knowingly filed meritless applications for relief or otherwise exploited administrative delays in the hearing and appeal process in order to 'buy time,' during which they could acquire a period of continuous presence that would qualify them for forms of relief that were unavailable to them when proceedings were initiated."). Congress also believed the "'extreme hardship' standard"—the final statutory requirement for suspension of deportation—"ha[d] been weakened by recent administrative decisions." H.R. Rep. No. 104-828, at 213 (1996) (Conf. Rep.).

**B.**

To address these concerns, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). *See* Pub. L. No. 104–208, Div. C, Tit. III, Subtit. A, sec. 304(a)(3), § 240A, 110 Stat. 3009-594 to 3009-596. Relevant here, IIRIRA amended the INA to its current form by replacing suspension of deportation with a new and more limited form of relief called "cancellation of removal." *See* 8 U.S.C. § 1229b; *see also* H.R. Rep. No. 104-828, at 213 (1996) (Conf. Rep.). And IIRIRA created the stop-time rule, designed to prevent an alien from accruing physical presence time during the pendency of immigration proceedings.

6

**1.**

IIRIRA introduced significant differences for aliens seeking relief from removal: Congress extended the length of time required for an alien to be physically present from seven to ten years, excluded from eligibility those aliens who were convicted of certain offenses under the INA, and strengthened the hardship requirement from "extreme hardship" to an "exceptional and extremely unusual hardship." *Compare* 8 U.S.C. § 1254(a)(1) (1994) (repealed), *with* 8 U.S.C. § 1229b(b)(1)(A)–(D). *See also* H.R. Rep. No. 104-828, at 213 (1996) (Conf. Rep.) ("The managers have deliberately changed the required showing of hardship from 'extreme hardship' to 'exceptional and extremely unusual hardship' to emphasize that the alien must provide evidence of harm to his spouse, parent, or child substantially beyond that which ordinarily would be expected to result from the alien's deportation.").

Under current law as adopted in IIRIRA, to be eligible for cancellation of removal an alien must: (1) have "been physically present in the United States for a continuous period of not less than *10 years* immediately preceding the date of such application;" (2) have "been a person of good moral character during such period;" (3) have "*not been convicted*" of certain offenses under the INA, including crimes involving moral turpitude, certain felonies, and document fraud; and (4) must "establish[ ] that removal would result in *exceptional and extremely unusual hardship* to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C.

§ 1229b(b)(1)(A)–(D) (emphasis added).[2] If an alien satisfies these four requirements, an Immigration Judge may grant cancellation of removal after balancing "the favorable and adverse factors" of the alien's particular case. *In re A-M-*, 25 I. & N. Dec. 66, 76 (B.I.A. 2009).

**2.**

To eliminate the incentive to delay immigration proceedings to accrue physical presence time, IIRIRA created the stop-time rule in a separate subsection titled "Special rules relating to continuous residence or physical presence." 8 U.S.C. § 1229b(d). Relevant here, the stop-time rule provides, "[f]or the purposes of [cancellation of removal]" an alien's period of continuous physical presence "shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a)." *Id.* § 1229b(d)(1).

The stop-time rule is only triggered upon service of a notice to appear "that, at the very least, 'specif[ies]' the 'time and place' of the removal proceedings." *Pereira v. Sessions*, 138 S. Ct. 2105, 2114 (2018) (quoting 8 U.S.C. § 1229(a)(1)(G)(i)) (alteration in original). Prior to *Pereira*, a number of other courts of appeals had adopted a Board interpretation finding § 1229b(d)(1) "does not impose substantive requirements" on notices to appear. *In re Camarillo*, 25 I. & N. Dec. 644, 647 (B.I.A. 2011).[3] *Pereira*

---

[2]    IIRIRA also prohibits the Attorney General from cancelling the removal of more than 4,000 aliens in a single fiscal year. 8 U.S.C. § 1229b(e)(1).

[3]    For courts of appeals' decisions deferring to the Board's interpretation under *Chevron*, see: *Moscoso-Castellanos v.*

dispatched with this understanding, characterizing § 1229(a)(1) as a definitional provision establishing hearing time and place among the minimum contents needed for a notice to appear to trigger the stop-time rule.

In sum, if an alien is served with a notice to appear prior to accruing sufficient physical presence time, he cannot satisfy the physical presence requirement—and is therefore ineligible for cancellation of removal—no matter how long his immigration proceedings continue. Service of a notice to appear that fails to set a hearing time and place does not trigger the stop-time rule.[4]

---

*Lynch*, 803 F.3d 1079, 1083 (9th Cir. 2015); *O'Garro v. Att'y Gen.*, 605 F. App'x 951, 953 (11th Cir. 2015) (per curiam); *Guaman-Yuqui v. Lynch*, 786 F.3d 235, 239–40 (2d Cir. 2015) (per curiam); *Gonzalez-Garcia v. Holder*, 770 F.3d 431, 434–35 (6th Cir. 2014); *Yi Di Wang v. Holder,* 759 F.3d 670, 674–75 (7th Cir. 2014); and *Urbina v. Holder*, 745 F.3d 736, 740 (4th Cir. 2014). We diverged from this consensus, maintaining before *Pereira* that a notice to appear "that fails to satisfy § 1229(a)(1)'s various requirements" does not trigger the stop-time rule. *Orozco-Velasquez v. Att'y Gen.*, 817 F.3d 78, 83 (3d Cir. 2016).

[4] *Pereira* leaves open whether the stop-time rule is triggered when an incomplete notice to appear is followed by a subsequent notice setting a hearing time and place. As we note below, this case does not demand an answer to that question.

**C.**

To be eligible for cancellation of removal, an alien also must have "been a person of good moral character" during a continuous ten-year period. 8 U.S.C. § 1229b(b)(1)(B). Under the INA, "[n]o person shall be regarded as, or found to be, a person of good moral character who," during the relevant time period satisfies any of a lengthy list of prohibited conduct. 8 U.S.C. § 1101(f); *see also id.* § 1101(f)(1)–(9). The list includes, for example, being "a habitual drunkard," *id.* § 1101(f)(1), deriving income "principally from illegal gambling activities," *id.* § 1101(f)(4), and giving false testimony to gain immigration benefits, *id.* § 1101(f)(6). Relevant here, an alien is not a person of good moral character if he engaged in alien smuggling activities. *Id.* § 1101(f)(3).[5]

**II.**

**A.**

Petitioner Pablo Antonio Mejia-Castanon is a citizen of Guatemala who entered the United States without permission in 2002. Years later, the Department of Homeland Security

---

[5] Section 1101(f)(3) provides that an alien is not a person of good moral character if he is "a member of one or more of the classes of persons, whether inadmissible or not, described in paragraph[ ] . . . (6)(E) . . . of section 1182(a)" of the INA. 8 U.S.C. § 1101(f)(3). Paragraph (6)(E), titled "Smugglers," provides in part that "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible." *Id.* § 1182(a)(6)(E)(i).

sought to remove him and served him with a document labeled "Notice to Appear" on October 17, 2013. This document specified the allegations against Petitioner and identified the legal authority for the removal proceedings against him, but it provided for a hearing "on a date to be set at a time to be set." App. 837. On November 13, 2013, Petitioner was served a notice of hearing, specifying the time and place of his removal proceedings. At a preliminary hearing before an Immigration Judge, Petitioner admitted to unlawfully entering the United States, conceded he was removable, and sought discretionary relief in the form of cancellation of removal, or alternatively, voluntary departure. *See* 8 U.S.C. §§ 1229b(b), 1229c.

On January 9, 2017, the Immigration Judge held a hearing on the merits of Petitioner's cancellation of removal application. During this hearing, Petitioner admitted to paying a total of $8,000 to an individual to help his brother and three daughters unlawfully enter the United States in 2015 and 2016 respectively—years after he was initially served with a notice to appear.[6] Because he admitted to helping his family enter the United States without permission, the Immigration Judge determined Petitioner had engaged in alien smuggling and was not a person of good moral character as defined in the INA. *See* 8 U.S.C. §§ 1101(f)(3), 1182(a)(6)(E). As a result, the

---

[6]     At oral argument, we asked Petitioner's counsel about a discrepancy in the record concerning when Petitioner's brother arrived in the United States. *See* Tr. of Oral Arg. at 3:20–5:8. Petitioner's counsel thereafter submitted a letter to the Court, pointing to record evidence that Petitioner's brother arrived in 2015—after Petitioner was served with a notice to appear. The Government has not disputed this.

11

Immigration Judge concluded Petitioner was ineligible for cancellation of removal. *See id.* § 1229b(b)(1)(B).

Petitioner appealed this decision to the Board of Immigration Appeals. He did not dispute engaging in prohibited conduct. He argued, instead, that events occurring after the service of a notice to appear could not be used to evaluate his good moral character because the stop-time rule, 8 U.S.C. § 1229b(d)(1), applied to the good moral character requirement, *id.* § 1229b(b)(1)(B).

After *Pereira*, it is evident that the incomplete October 13, 2013 notice did not trigger the stop-time rule. For purposes of Mejia's petition, we assume the subsequent November 13, 2013 notice of hearing triggered the stop-time rule because it provided the minimum information—hearing time and place—needed to facilitate Petitioner's appearance at his removal proceeding. Because we conclude the stop-time rule does not apply to the good moral character period, we have no occasion to decide whether this two-step notice process satisfies § 1229(a).

Petitioner's alien smuggling transgressions occurred in 2015 and 2016. Both incidents, therefore, followed the November 13, 2013 notice of hearing. If this notice triggers the stop-time rule, as we assume it does for purposes of evaluating Petitioner's contention, then under his theory the alien smuggling incidents would fall outside the good moral character ten-year window. Under this understanding, Petitioner remained a person of good moral character, eligible for cancellation of removal.

**B.**

12

Relying on its prior published decision, *In re Ortega-Cabrera*, 23 I. & N. Dec. 793, 796–97 (B.I.A. 2005), the Board rejected Petitioner's interpretation of the stop-time rule and denied his appeal. *Ortega-Cabrera* explained that, prior to IIRIRA's 1996 amendments to the INA, the Board had understood the physical presence and good moral character time periods to be identical and to "continu[e] to accrue through the time [the Board] decided an alien's appeal." *Id.* at 794. But the stop-time rule, explained *Ortega-Cabrera*, "altered the calculation" of the physical presence time period "by halting the accrual of such presence with the service of the [notice to appear]." *Id.* at 795. The Board concluded that the interaction between the stop-time rule and the good moral character requirement was ambiguous. *See id.*

In light of the stop-time rule, *Ortega-Cabrera* said there were "three possible interpretations" of the good moral character requirement's time period. *Id.* First, the Board could continue to treat the physical presence and good moral character time period as identical, applying the stop-time rule to make both requirements "bounded at the end" by the service of a notice to appear. *Id.* Second, the periods could be identical but end instead on "the date that the application for cancellation of removal is first filed with the court." *Id.* And third, the two periods could diverge. Under this final reading, the good moral character period would be the ten years prior to the Board's final administrative decision—in other words, the good moral character period would be read "consistent with [the Board's] long-established practice" of allowing the good moral character time period to accrue until a final administrative decision. *Id.*

13

After acknowledging that each interpretation presented problems, *Ortega-Cabrera* adopted the final option, concluding it most aligned with congressional intent. The first interpretation—applying the stop-time rule to the good moral character requirement—would undermine the INA's definition of good moral character, *see* 8 U.S.C. § 1101(f), because this reading would allow "an alien who engages in a disqualifying act," such as alien smuggling or giving false testimony at his immigration hearing, to remain eligible for cancellation of removal if the act occurred after the service of a notice to appear. *See Ortega-Cabrera*, 23 I. & N. Dec. at 797. The second option—although appearing consistent with the statute's text—"is thrown into considerable doubt" when read with the stop-time rule because that rule had made the phrase "immediately preceding the date of the application" inapplicable in determining the physical presence requirement. *Id.* at 795.

The final option, in contrast, did not undermine the INA's definition of good moral character, nor did it alter the Board's "well-established practice of treating the application as a continuing one for the purposes of assessing an alien's good moral character." *Id.* at 797. Finding "no indication that Congress, in creating the 'stop-time' rule, intended to alter th[is] well-established practice," *id.*, *Ortega-Cabrera* adopted this final interpretation. It held that "an application for cancellation of removal remains a continuing one for purposes of evaluating an alien's moral character, and . . . the 10-year period during which good moral character must be established ends with the entry of a final administrative decision." *Id.* at 798.

Petitioner sought review of the Board's decision before this Court.

### III.

The Board had jurisdiction under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15.[7] We have jurisdiction under 8

---

[7] In supplemental briefing Petitioner argues the Supreme Court's decision in *Pereira* strips the Immigration Court's (and the Board's) jurisdiction to adjudicate the underlying removal proceedings. From *Pereira*'s observation that "a notice that does not specify when and where to appear for a removal proceedings is not a 'notice to appear' that triggers the stop-time rule," Petitioner infers that service of an incomplete notice to appear divests the Immigration Judge of jurisdiction. 138 S. Ct. at 2115. Our recent decision in *Nkomo v. Attorney General*, ___ F.3d___, 2019 WL 3048577 (3d Cir. July 12, 2019), rejected Petitioner's understanding of *Pereira* and thus forecloses his jurisdictional challenge. In *Nkomo* we joined seven courts of appeals to conclude *Pereira*'s explanation of "notice to appear" does not implicate an immigration judge's authority to adjudicate. *Nkomo*, 2019 WL 3048577, at *2; *accord Ortiz-Santiago v. Barr*, 924 F.3d 956, 957–58, 962–64 (7th Cir. 2019); *Ali v. Barr*, 924 F.3d 983, 986 (8th Cir. 2019); *Banegas Gomez v. Barr*, 922 F.3d 101, 110–12 (2d Cir. 2019); *Soriano-Mendosa v. Barr*, 786 F. App'x 796, 801–02 (10th Cir. 2019); *Santos-Santos v. Barr*, 917 F.3d 486, 489–91 (6th Cir. 2019); *Karingithi v. Whitaker*, 913 F.3d 1158, 1160–61 (9th Cir. 2019); *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 314–15 (6th Cir. 2018); *Leonard v. Whitaker*, 746 F. App'x 269, 269–70 (4th Cir. 2018) (per curiam); *United States v. Perez-Arellano*, 756 F. App'x. 291, 294 (4th Cir. 2018) (per

U.S.C. § 1252(a). Although the INA strips us of jurisdiction over "any judgment regarding the granting of relief under section . . . 1229b [(cancellation of removal)]," 8 U.S.C. § 1252(a)(2)(B)(i), "we have interpreted this provision to apply only with respect to discretionary aspects of the denial of cancellation of removal." *Singh v. Att'y Gen.*, 807 F.3d 547, 549 n.3 (3d Cir. 2015) (citing *Mendez-Moranchel v. Ashcroft*, 338 F.3d 176, 178 (3d Cir. 2003)). Whether the stop-time rule applies to the good moral character requirement is not a "discretionary aspect" of a cancellation of removal application. Rather, it is a question of law which is exempt from § 1252(a)(2)(B)(i)'s jurisdiction limitation. *See* 8 U.S.C. § 1252(a)(2)(D) ("Nothing in subparagraph (B) or (C), or in any other provision of this chapter . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.").

## IV.

As we set forth below, the good moral character provision timeframe is ambiguous because its text is

---

curiam); *see also Matter of Bermudez-Cota*, 27 I. & N. Dec. 441, 441–45 (B.I.A. 2018). The jurisdiction-vesting regulation departs from the statutory stop-time rule, we reasoned, because it "does not cross-reference" § 1229(a)'s notice to appear. *Nkomo*, 2019 WL 3048577, at \*3. *Pereira* spoke to a narrow issue and did not hint at the sweeping consequences Petitioner envisions. We therefore reject his jurisdictional challenge.

susceptible to two reasonable interpretations.[8] The legal question here therefore "implicat[es] an agency's construction of the statute which it administers," so we "appl[y] the principles of deference described in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)." *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (quotation marks omitted).[9] "Under *Chevron*, we take a two-step approach, first deciding whether the statutory provision interpreted by the [Board] is ambiguous and then, if it is, giving deference to the [Board]'s reasonable interpretation of the INA." *Mondragon-Gonzalez v. Att'y Gen.*, 884 F.3d 155, 158 (3d Cir. 2018) (citation omitted). IIRIRA's 1996 amendments to the INA—in particular, the stop-time rule—rendered the applicable timing of the good moral character provision

---

[8] We cannot agree with the Dissent's view that the timeframe is unambiguous because it reads the good moral character provision in isolation, ignoring the statutory context. *See infra* section IV.A.

[9] "It is clear that principles of *Chevron* deference are applicable to this statutory scheme" because the "INA provides that '[t]he Attorney General shall be charged with the administration and enforcement' of the statute and that the 'determination and ruling by the Attorney General with respect to all questions of law shall be controlling.'" *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (quoting 8 U.S.C. § 1103(a)(1)). Additionally, the Supreme Court has "recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *Id.* at 425 (quoting *I.N.S. v. Abudu*, 485 U.S. 94, 110 (1988)).

ambiguous. And we defer to the Board's reasonable interpretation of the statute.

**A.**

As we have noted, the good moral character time period, 8 U.S.C. § 1229b(b)(1)(B), is ambiguous because its text is susceptible to two reasonable interpretations.

Read in isolation, the question presented here initially appears straightforward. The statute provides that an alien is eligible for cancellation of removal if, *inter alia*, he "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application" and "has been a person of good moral character *during such period*." 8 U.S.C. § 1229b(b) (emphasis added). How does one calculate the time period for measuring good moral character? Petitioner argues this period is the same as the physical presence requirement, *i.e.*, the ten-year period "immediately preceding the date of such application," because the phrase "during such period" refers directly to the antecedent language. Indeed, prior to the 1996 amendments, the Board read an earlier, similar version of the statute as treating the two periods as identical.[10] It interpreted "such

---

[10]   The pre-1996 language provided that an alien was eligible for suspension of deportation if, *inter alia*, the alien had been "physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application," and "proves that during all of such period he was and is a person of good moral character." 8 U.S.C. § 1254(a)(1) (1994) (repealed).

application" to be "a continuing one," allowing the time periods to accrue until the Board's final administrative decision on an application for cancellation of removal. *Ortega-Cabrera*, 23 I. & N. Dec. at 794; *see supra* note 10.

But we cannot read the statute in isolation.[11] Instead, we must "bear[ ] in mind the fundamental canon of statutory

We do not believe Congress intended to alter the good moral character time period when it changed the phrasing of the statute from "during all of such period he *was and is* a person of good moral character," *id.* (emphasis added) to "*has been* a person of good moral character during such period," *id.* § 1229b(b)(1)(B) (emphasis added). "Has been" is the present perfect tense, denoting "an act, state, or condition that is now completed or continues up to the present." Chicago Manual of Style § 5.132, at 268 (17th ed. 2017). It is used to refer either to time in the indefinite past, or past action that continues until the present. *Id.*

[11] As our dissenting colleague correctly observes, § 1229b(b)(1)(A) and (B) are clear when read in isolation. *See* Dissenting Op. at 1–2. If these provisions alone spelled out the requirements for cancellation of removal, we would resolve this case without deferring to the Board's interpretation. Section 1229b(b)(1)(A) and (B), in isolation, provide that both the continuous physical presence and good moral character periods end with the final administrative decision. But this reading is at odds with the later added stop-time rule. *See* 8 U.S.C. § 1229b(d)(1) ("For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear under section 1229(a) . . . ."). What

construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) (quotation marks omitted); *see also F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."). When read in context with the stop-time rule, § 1229b(b)(1)(B)'s language is susceptible to two different interpretations. *See Rodriguez-Avalos v. Holder*, 788 F.3d 444, 453 (5th Cir. 2015) ("[W]e agree with the [the Board] and the Seventh Circuit that the 'interplay of the statutory language at issue here is ambiguous and subject to multiple possible interpretations."); *Duron-Ortiz v. Holder*, 698 F.3d 523, 527 (7th Cir. 2012) ("The ambiguity arises when we read the statute in conjunction with the stop-time provision of § 1229b(d)(1)."); *cf. Moscoso-Castellanos v. Lynch*, 803 F.3d 1079, 1083 (9th Cir. 2015) ("Because the statute is susceptible to several interpretations, we hold, at *Chevron* step one, that the statute is ambiguous.").

**1.**

Under the interpretation advanced by Petitioner, the stop-time rule applies to both the physical presence and the good moral character time periods—closing both windows when a notice to appear is served.

---

is unambiguous in isolation, therefore, becomes ambiguous when read alongside other relevant provisions.

Recall that the stop-time rule provides that "any period" of "continuous physical presence . . . shall be deemed to end when the alien is served a notice to appear." 8 U.S.C. § 1229b(d)(1). The good moral character requirement refers directly to the "period" of physical presence. *See* 8 U.S.C. § 1229b(b) (requiring that the alien "has been a person of good moral character during such period"). By tethering its timeframe to the continuous physical presence period, the good moral character requirement incorporates the stop-time rule's limitation. Read so, the good moral character and physical presence time period would be identical, each terminating with the service of a notice to appear that meets the requirements of § 1229(a)(1).

**2.**

But this is not the only reasonable interpretation. Alternatively, IIRIRA's 1996 amendments to the INA could be read as having no effect on the good moral character time period. Indeed, the stop-time rule's language does not mention good moral character. IIRIRA created the stop-time rule in a separate subsection, titled "Special rules relating to continuous residence or physical presence." 8 U.S.C. § 1229b(d). And the rule only provides that an alien's "continuous residence or continuous physical presence . . . shall be deemed to end when the alien is served a notice to appear." *Id.* § 1229b(d)(1). Nothing in the stop-time rule's text indicates it should apply beyond the continuous physical presence requirement to circumscribe the good moral character time period. The Dissent does not consider this construction, as it focuses exclusively on the language of § 1229b(b)(1)(A) and (B). But

21

the plain language of § 1229b(d)(1) casts doubt on whether the Dissent's interpretation is the only reasonable one.[12]

Under this second interpretation, the good moral character requirement would be the "10 years immediately preceding the date of such application." 8 U.S.C. § 1229b(b)(1)(A). In keeping with the prior understanding of the phrase "such application," this period would run through the Board's final administrative decision on the alien's cancellation of removal application.[13]

---

[12] We believe the Dissent's position reinforces the ambiguity. The Dissent acknowledges the perplexity of its plain reading: "A decision that the stop-time rule for both physical presence and good moral character is *10 years before the application* is a windfall for an applicant like Mejia-Castanon, for the acts in this case . . . ." Dissenting Op. at 1 (emphasis added). Not so. Aliens profit from the scheme only if the good moral character period ends upon service of a *notice to appear*, the position advanced by Petitioner. But nothing in the text of § 1229b(b)(1)(A) or (B) supports such a reading because neither provision's timeframe, in isolation, is tied to service of a notice to appear. Thus we must interpret the interplay between § 1229b(b)(1)(A)–(B) and § 1229b(d)(1), which necessarily invites ambiguity.

[13] In *In re Ortega-Cabrera*, 23 I. & N. Dec. 793, 796–97 (B.I.A. 2005), the Board also suggested a third potential interpretation: "[The good moral character time period] may be the 10-year period ending on the date that the application for cancellation of removal is first filed with the court." *Id.* at 795. We disagree.

As explained in *Ortega-Cabrera*, prior to the IIRIRA's 1996 amendments to the INA, the Board had interpreted "such

22

Because § 1229b(b)(1)(B)'s text—when read in context with the stop-time rule— is susceptible to two reasonable interpretations, it is ambiguous at step one of *Chevron*.

**B.**

Under *Chevron*'s second step, we "may not substitute [our] own construction of a statutory provision for a reasonable

application" to be "a continuing one," allowing the time periods to accrue until the Board's final administrative decision on an application for cancellation of removal. 23 I. & N. Dec. at 794. We presume Congress is aware of an administrative interpretation of a statute and that it adopts that interpretation when it reenacts the statute in materially similar language. *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) (citing *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."); *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

Had Congress enacted § 1229b(b)'s "immediately preceding the date of such application" language on a clean slate, it would seem obvious that the best reading of the statute would be its literal one. But because Congress used the same language in § 1229b(b) as it did in § 1254(d), it was presumptively aware of the Board's longstanding (albeit nonliteral) interpretation of the phrase "such application."

interpretation made by the" Board. *Chevron*, 467 U.S. at 844. When reviewing the Board's interpretation, "we do not ask whether it is the best possible interpretation of Congress's ambiguous language. Instead, we extend considerable deference to the agency and inquire only whether it made 'a reasonable policy choice' in reaching its interpretation." *Am. Farm Bureau Fed'n v. E.P.A.*, 792 F.3d 281, 295 (3d Cir. 2015) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005)). Because the Board's interpretation is both a reasonable reading of the text and a reasonable policy choice, we join our sister circuits in concluding that its decision in *Ortega-Cabrera* is entitled to *Chevron* deference. *See Rodriguez-Avalos v. Holder*, 788 F.3d 444, 455 (5th Cir. 2015); *Duron-Ortiz*, 698 F.3d at 528.

*First*, the Board's interpretation—declining to apply the stop-time rule to the good moral character time period and concluding that the period accrues through a final administrative decision—is a reasonable understanding of the statute's text. At a minimum, it embodies "a permissible construction of the statute." *Aguirre-Aguirre*, 526 U.S. at 424 (citation and quotation marks omitted). As explained above, it is reasonable to interpret the stop-time rule to have no effect on the good moral character time period, as the stop-time rule's text never mentions good moral character. *See* 8 U.S.C. § 1229b(d).

*Second*, the Board's interpretation is "a reasonable policy choice," *Brand X*, 545 U.S. at 986, because it comports with congressional intent and avoids results inconsistent with the broader purpose of the INA.

24

The Board's interpretation is consistent with congressional intent. Congress created the stop-time rule to eliminate the incentive to delay immigration proceedings in order to accrue physical presence time. *See Rios-Pineda*, 471 U.S. at 450 (explaining the "substantial incentive" for aliens facing deportation "to prolong litigation" in order to "stall[ ] physical departure in the hope of satisfying" the seven-year requirement); *see also* H.R. Rep. 104-469, at 122 (1996) (explaining that aliens were exploiting suspension of deportation by seeking to "accrue time toward the seven year threshold even after they ha[d] been placed in deportation proceedings"). There was not, however, a similar incentive related to accruing good moral character time. *See Ortega-Cabrera*, 23 I. & N. Dec. at 797 (explaining there was "no indication that Congress, in creating the 'stop-time' rule, intended to alter" the Board's "well-established practice" of treating the good moral character time period as accruing until its final administrative decision). And Petitioner identifies no evidence Congress sought to alter the good moral character time period.

Finally, the Board's interpretation avoids results inconsistent with the broader purpose of the INA. Under Petitioner's interpretation, an alien could engage in a disqualifying act—like alien smuggling or testifying falsely at an immigration hearing—and yet remain eligible for cancellation of removal, so long as the act occurred after the service of a *Pereira*-compliant notice to appear. *See Ortega-Cabrera*, 23 I. & N. Dec. at 797. Good moral character, however, involves "one of the most essential considerations in deciding who is allowed to remain in the United States—an individual's character." *Duron-Ortiz*, 698 F.3d at 528. "It is only logical that the agency consider an applicant's most recent

25

negative behavior when making such a decision, as the more recent an individual's behavior is, the more accurately it reflects his or her character." *Id.* This choice is wholly reasonable.

## V.

The Board's interpretation of the good moral character time period is entitled to *Chevron* deference. Under that reasonable interpretation, the stop-time rule does not apply to the good moral character requirement. Rather, events occurring in the ten-year period prior to the final administrative decision on the alien's application for cancellation of removal are subject to the good moral character requirement. We will therefore deny the petition.

**SILER, *Circuit Judge*, dissenting.**

I respectfully dissent from the majority opinion, because I do not find ambiguity in the statute involved. Because there is no ambiguity in the statute, we should not give deference to the Board in its interpretation of the INA. *See Mondragon-Gonzalez v. Att'y Gen.*, 884 F.3d 155, 158 (3d Cir. 2018). The Board concludes that the stop-time rule applies to the physical presence of not less than 10 years immediately preceding the date of the application for cancellation of removal but does not apply to the petitioner's requirement of being a person of good moral character during the same continuous 10-year period. That conclusion follows logic but it does not follow the statute. A decision that the stop-time rule for both physical presence and good moral character is 10 years before the application is a windfall for an applicant like Mejia-Castanon, for the acts in this case which would preclude him from being eligible for a cancellation of removal would allow him to "beat the system."

However, the plain language of the statute provides otherwise, and Congress has had an opportunity to amend the statute, as recited in the majority opinion. Thus, the current statute reads:

> The Attorney General may cancel removal of . . . an alien who is inadmissible or deportable . . . if the alien--
>
> > (A) has been physically present in the United States for a continuous period of not less than 10 years immediately

> preceding the date of such application; [and]
>
> (B) has been a person of good moral character during such period . . . .

8 U.S.C. § 1229b(b)(1)(A)-(B).

I realize, as the majority indicates, that two other circuits have ruled otherwise. *See Rodriguez-Avalos v. Holder*, 788 F.3d 444, 453 (5th Cir. 2015); *Duron-Ortiz v. Holder*, 698 F.3d 523, 527 (7th Cir. 2012). The Board ruled likewise. *See In re Ortega-Cabrera*, 23 I. & N. Dec. 793, 796-97 (B.I.A. 2005). However, in reading the plain language of the statute, I cannot agree. Therefore, I would grant the petition for review.