PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1603
_____

MUHANAD AL-GOUDI AL-HASANI,
                                                    Appellant

v.

SECRETARY UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;
DIRECTOR UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES;
DIRECTOR NEWARK NEW JERSEY FIELD OFFICE
IMMIGRATION
& CUSTOMS ENFORCEMENT
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-20-cv-08984)
District Judge: Honorable John M. Vazquez
_____

Argued on June 14, 2023

Before:  PORTER, FREEMAN and FISHER, *Circuit Judges*.

(Filed: August 30, 2023)

Jeremy Bressman
Benjamin F. Cooper     ARGUED
Steven W. Perlstein
Danielle L. Rose
Kobre & Kim
800 Third Avenue, 6th Floor
New York, NY 10022
        *Counsel for Appellant*

Aneesa Ahmed     ARGUED
Brian M. Boynton, Principal Deputy Assistant Attorney
General
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, DC 20044
        *Counsel for Appellee*

_____

## OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Muhanad Al-Hasani, a native of Syria, applied to be naturalized as a U.S. citizen. The Department of Homeland Security (DHS), through U.S. Citizenship and Immigration Services (USCIS), denied his application. Al-Hasani petitioned the District Court for review, and that Court denied his petition. We will affirm.

2

I.

A. Factual Background

Muhanad Al-Hasani was born in Syria in 1966. He worked there as a human rights lawyer. In February 2003, Al-Hasani married Sabah Khalili, a native of Morocco who had been living in Syria. When Khalili became pregnant, she decided to move home and raise the child in Morocco. Al-Hasani bought her a house in Casablanca. His son A.L. was born in 2004. He "thought that when [he] was inevitably detained" because of his human rights work, "at least [he] could hope to come out of prison and find a grown son." App. 133. Soon after A.L's birth, the Syrian government imposed a travel ban on Al-Hasani, which prevented him from leaving the country and seeing his wife and son.

In August 2005, Al-Hasani married fellow Syrian Hiam Jouni. He did not divorce Khalili first; Syrian law did not require him to. In 2007, Jouni gave birth to Al-Hasani's son A.A. In 2009, Al-Hasani was arrested for crimes including "weakening the State's 'prestige'" and "'transferring' false and exaggerated information that weakens 'national sentiments.'" App. 208. Jouni was "unhappy with [Al-Hasani] for getting thrown in jail and . . . jeopardizing [their] son['s] . . . future." App. 135.

In 2011, Al-Hasani was released from prison. Soon after, though, Wikileaks reported that Al-Hasani had provided human rights information to the U.S. embassy. Al-Hasani fled Syria the same day, but Jouni did not want to leave. She stayed in Damascus with A.A. Al-Hasani has not seen her since 2011, though he has a close relationship with A.A.

Al-Hasani was paroled into the United States in December 2011. In October 2012, he was granted permanent resident status. After he arrived in the United States, Al-Hasani

3

learned that his first wife, Khalili, and son A.L. were doing poorly and had lost the house he bought. He petitioned for them to join him in the United States, which they did. In 2016, when Khalili's mother got sick and needed care, Khalili and A.L. moved back to Morocco. Al-Hasani's relationship with Khalili ended.

In a 2019 declaration, Al-Hasani described legal barriers to divorce. Al-Hasani and Jouni could not divorce in Syria because he would need a lawyer to exercise a power of attorney and act on his behalf—but when he has tried in the past to confer powers of attorney for other purposes, "those powers of attorney have not been recognized and [his] colleagues have run into problems with the Syrian Bar Association, the intelligence services, or both." App. 136. Al-Hasani could not divorce Jouni in New Jersey because their marriage, which occurred after Al-Hasani married Khalili, is not recognized under New Jersey law.

Khalili could not get a divorce in Morocco because "she would need to allege specific grounds," such as cruelty, that did not apply. App. 136. However, Al-Hasani did not mention any legal barriers to divorcing Khalili in New Jersey. Indeed, this is what eventually happened—but it took place after Al-Hasani appealed to our Court and thus is not in the record. We discuss the divorce further in Part II.B., below.

Al-Hasani also described non-legal barriers to divorce. He explained that "there is a stigma associated with divorce in Syria" and he did not want to subject Jouni "to the negative social consequences of divorce simply for the sake of my naturalization." App. 136. Al-Hasani did not want to divorce Khalili because he believed that would make A.L. feel "separated" from his father. App. 93.

Al-Hasani contends he "never lived in a marital relationship with [Khalili and Jouni] at the same time." App.

4

56. He supports both his children financially.

B. Procedural Background

In September 2017, Al-Hasani applied for naturalization, candidly describing the circumstances of his two marriages. In August 2019, USCIS denied his application because he "remain[ed] married to both [his] wives at the same time" and "[t]he practice of polygamy is . . . a statutory bar to [the] finding of good moral character" required for naturalization. App. 81. The denial was "without prejudice toward the filing of a new application for naturalization in the future." App. 82.

Al-Hasani requested a hearing on the denial, as permitted by 8 U.S.C. § 1447(a), and USCIS reaffirmed its denial. USCIS explained that "there is no dispute that you are married to two people at the same time," and "[t]he practice of polygamy," which is "the act of being married to two or more individuals at the same time," is "a statutory bar to finding good moral character." App. 97–98.

Al-Hasani filed a petition for review in the District Court under 8 U.S.C. § 1421(c). The District Court granted summary judgment for DHS. The Court held that Al-Hasani did not "prov[e] that he does not fall within the category of individuals barred from a finding of good moral character as a result of practicing polygamy." App. 11. The Court alternatively held that if the deference described in *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), applied, DHS's interpretation of the statute and regulations was reasonable and entitled to deference. Al-Hasani appeals.

5

II.[1]

An individual seeking to naturalize as a U.S. citizen "has the burden of proving 'by a preponderance of the evidence that he or she meets all of the requirements for naturalization.'" *Saliba v. Att'y Gen.*, 828 F.3d 182, 189 (3d Cir. 2016) (quoting 8 C.F.R. § 316.2(b)). Naturalization requires "[s]trict compliance with all the congressionally imposed prerequisites." *Id.* (quoting *Fedorenko v. United States*, 449 U.S. 490, 506 (1981)). "[W]hen doubts exist concerning a grant of [citizenship], generally . . . they should be resolved in favor of the United States and against the claimant." *Id.* (quoting *United States v. Manzi*, 276 U.S. 463, 467 (1928)).

The Immigration and Nationality Act (INA) provides that "[n]o person . . . shall be naturalized unless," for the five years preceding his naturalization application and from the application date forward, he "is a person of good moral character." 8 U.S.C. § 1427(a). "No person shall be regarded as, or found to be, a person of good moral character" if, during the five-year statutory period, he or she is part of "the class[] of persons . . . described in paragraph[] . . . (10)(A) of section 1182(a)." *Id.* § 1101(f)(3). That paragraph, in turn, provides that "[a]ny immigrant who is coming to the United States to practice polygamy is inadmissible." *Id.* § 1182(a)(10)(A). The regulations also speak to good moral character, saying it is lacking "if during the statutory period" the individual "[h]as practiced or is practicing polygamy" or "[w]illfully failed or refused to support dependents." 8 C.F.R. § 316.10(b)(2)(ix),

---

[1] The District Court had jurisdiction under 8 U.S.C. § 1421(c) (providing for district court review of denial of a naturalization application). We have jurisdiction under 28 U.S.C. § 1291 (providing for review of final decisions of district courts).

(b)(3)(i).

At the outset, we confront a question about the framework for our analysis. The issue on appeal is whether the District Court erred in affirming DHS's denial of Al-Hasani's naturalization application. Naturalization is governed by the INA, which the Secretary of Homeland Security administers. 8 U.S.C. § 1103(a)(1). The INA provides that "determination[s] and ruling[s] by the Attorney General with respect to all questions of law shall be controlling" upon the Secretary of Homeland Security. *Id.* Normally, when addressing a question that "'implicates an agency's construction of the statute which it administers,' . . . we 'apply the principles of deference described in *Chevron*.'" *Mejia-Castanon v. Att'y Gen.*, 931 F.3d 224, 232 (3d Cir. 2019) (alterations omitted) (quoting *INS. v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999)).[2]

But Congress has instructed that a district court's review of a denial of a naturalization application "shall be de novo, and the court shall make its own . . . conclusions of law." 8 U.S.C. § 1421(c). This standard percolates through to us as well, because "[w]e review the District Court's grant of summary judgment *de novo*, applying the same standard as the District Court." *Koszelnik v. Sec'y of Dep't of Homeland Sec.*, 828 F.3d 175, 179 n.5 (3d Cir. 2016).

The question, then, is whether *Chevron* deference applies to USCIS's decision, or whether our review is de novo as § 1421(c) commands. The potential conflict between

---

[2] The Supreme Court recently granted certiorari on the issue of whether *Chevron* should be "overrule[d] . . . or at least clarif[ied]." *Loper Bright Enters. v. Raimondo*, No. 22-451, Pet. for Writ of Cert. (Nov. 10, 2022), Order Granting Cert. (May 1, 2023). For now, however, we are still bound by *Chevron* and its progeny.

*Chevron* and the statutory standard could, in a different case, pose interesting and complex questions.[3] Here, we need not resolve the issue because the outcome is the same either way. If *Chevron* were not on the table, we would interpret the statute de novo. *See* 8 U.S.C. § 1421(c). And if we were to apply *Chevron*, at step one we would use the "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, to ascertain whether "Congress has directly spoken to the precise question at issue," *id.* at 842. Here, as we will explain, Congress has done so. The polygamy bar is not ambiguous as applied to Al-Hasani. Because "the intent of Congress is clear," "that is the end of the matter" and we "must give effect to the unambiguously expressed intent of Congress." *See id.* at 842–43.

So the two analytical paths converge. Whether at *Chevron* step one or through § 1421(c) de novo review—which amount to the same exercise—we conclude Al-Hasani may not be naturalized because of the statutory polygamy bar.

A. The Polygamy Bar Applies to Al-Hasani

Unsurprisingly, we will "start where we always do: with the text." *Van Buren v. United States*, 141 S. Ct. 1648, 1654 (2021). The INA does not define polygamy. *See* 8 U.S.C. § 1101. Even so, DHS argues the statute unambiguously bars Al-Hasani's naturalization because the 2009 edition of Black's

---

[3] The Seventh Circuit has reasoned that because "Congress specifically calls for de novo review in naturalization cases, while ordering great deference in other immigration contexts," the § 1421(c) de novo standard applies and courts should not employ *Chevron* deference in cases like this one. *O'Sullivan v. U.S. Citizenship & Immigr. Servs.*, 453 F.3d 809, 812 (7th Cir. 2006). We have not addressed the question directly. *See Koszelnik*, 828 F.3d at 179–80.

Law Dictionary defines "polygamy" as "[t]he state or practice of having more than one spouse simultaneously." Appellee's Br. 24. We must examine the word's "ordinary meaning . . . at the time Congress enacted the statute." *United States v. Smukler*, 991 F.3d 472, 482 (3d Cir. 2021) (quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070, 2074 (2018)). This means the relevant years are 1891, when "polygamy" appeared in the Immigration Act, and 1990, when the current language of the polygamy bar was enacted—not 2009. In addition, a word's ordinary meaning can include more than just its legal meaning, so it is useful to look to both legal and general dictionaries. *See Wis. Cent.*, 138 S. Ct. at 2071 (citing Webster's, the Oxford English Dictionary, and Black's).

In 1891, Black's defined polygamy as "[t]he offense of having several wives or husbands at the same time" or "[t]he offense committed by a layman in marrying while any previous wife is living and undivorced." *Polygamy*, Black's Law Dictionary (1891 ed.). That aligns with DHS's preferred definition: anyone who is legally married to more than one person at once. But Black's also went on to say:

> A bigamist or polygamist, in the sense of the . . . act of [C]ongress of March 22, 1882, is a man who, having contracted a bigamous or polygamous marriage, and become the husband at one time, of two or more wives, maintains that relation and status at the time when he offers to be registered as a voter.

*Id.* (emphasis omitted). Maintaining both the "relation and status" of marriage implies that all the ties of marriage—financial, emotional, physical—are ongoing with multiple people at once. Although this definition pertains to a federal statute not at issue here, it shows that "polygamy" had multiple meanings in 1891.

9

A general dictionary in 1890 defined "polygamous" as "a union including more than one spouse of either sex, sanctioned in respect to plurality of wives by the law of some countries, but not recognized as marriage by the law of Christian states." *Polygamous*, 4 Century Dictionary (1890). So in 1891, polygamy could also carry religious or cultural connotations.

In 1990, Black's defined polygamy as "[t]he offense of having several wives or husbands at the same time." *Polygamy*, Black's Law Dictionary (6th ed. 1990). It also said, quoting the Model Penal Code, that "[a] person is guilty of polygamy, a felony of the third degree, if he marries or cohabits with more than one spouse at a time in purported exercise of the right of plural marriage." *Id.* In 1990, Webster's defined "polygamy" as "marriage in which a spouse of either sex may have more than one mate at one time." *Polygamy*, Webster's Ninth New Collegiate Dictionary (1990). The word "may" implies permission—that is, a situation where all the spouses consent to the arrangement. So the 1990 definitions of polygamy, like the 1891 definitions, encompass simply being legally married to more than one person and also something more: doing so with permission or as an expression of a right or a religious or cultural belief.

The statutory term "practice" is important as well. An individual does not have good moral character if he or she "is coming to the United States to *practice* polygamy." 8 U.S.C. § 1182(a)(10)(A) (emphasis added). Turning once again to contemporary dictionaries, Black's definition of "practice" around 1907 (the year the word first appeared in the statute) is unhelpfully limited to the legal term of art: "The form or mode of proceeding in courts of justice for the enforcement of rights or the redress of wrongs . . . ." *Practice*, Black's Law Dictionary (1910 ed.). A general dictionary from 1907 defines

10

"practice" as "the habit of doing anything . . . performance . . . method." *Practice*, Chambers's Twentieth Century Dictionary of the English Language (1907). Another general dictionary included among its definitions "[f]requent or customary performance; habit; usage; custom." *Practice*, 4 Century Dictionary (1890).

In 1990, when the statute was amended again (retaining the word "practice"), Black's defined "practice" as "[r]epeated or customary action; habitual performance; a succession of acts of similar kind; custom; usage." Practice, Black's Law Dictionary (6th ed. 1990). The 1990 Webster's included as definitions "to do or perform often, customarily, or habitually" and "to do something customarily." Practice, Webster's Ninth New Collegiate Dictionary (1990).

These definitions indicate that, while "practice" may have different shades of meaning, it connotes doing something intentionally rather than passively, mistakenly, or through an oversight. In addition, "practice" is something that can be ascertained objectively by observing a person's actions. Unlike beliefs, which require inquiry into a person's subjective state of mind, his or her practices are apparent, objectively, to outside observation.

Besides examining the ordinary meaning of words used in a statute, we also look to statutory history, which is important in ascertaining a word's meaning in context. *United*

*States v. Hansen*, 143 S. Ct. 1932, 1943 (2023).[4] Al-Hasani argues that the changes between earlier versions of the polygamy bar and the current version show that the current statute does not prohibit his naturalization because it is forward looking—concerned with behavior after an individual arrives in the United States, not before. We agree that statutory history is important to the textual interpretation of the polygamy bar, but we disagree with Al-Hasani on the conclusion to be drawn from it.

The Immigration Act of 1891 excluded "polygamists" without elaborating further. An Act in Amendment to the Various Acts Relative to Immigration, Pub. L. 51-551, 26 Stat. 1084 (1891).[5] The 1907 version of the polygamy bar excluded "polygamists, or persons who admit their belief in the practice of polygamy." An Act to Regulate the Immigration of Aliens, Pub. L. 59-96, § 2, 34 Stat. 898 (1907).[6] The added language indicated Congress's concern with both what an individual

---

[4] Statutory history is "the record of enacted changes Congress made to the relevant statutory text over time." *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 906 (2019) (Gorsuch, J., dissenting). It is "the sort of textual evidence everyone agrees can sometimes shed light on meaning." *Id.* It is distinct from legislative history—committee reports and the like—the mining of which is "disfavored" as a statutory interpretation strategy. *Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (Willett, J., concurring).

[5] Available at https://heinonline.org/HOL/P?h=hein.statute/sal026&i=1142 (visited July 10, 2023).

[6] Available at https://heinonline.org/HOL/P?h=hein.statute/sal034&i=930 (visited July 10, 2023).

objectively did and what he subjectively believed. This dual focus on belief and practice remained in the text of two successor statutes. An Act to Regulate the Immigration of Aliens, Pub. L. 64-301, § 3, 39 Stat. 874 (1917) ("polygamists, or persons who practice polygamy or believe in or advocate the practice of polygamy")[7]; An Act to Revise the Laws Relating to Immigration, Pub. L. 82-414, § 212, 66 Stat. 163 (1952) ("[a]liens who are polygamists or who practice polygamy or advocate the practice of polygamy").[8]

In 1990, Congress amended the statute to the language that remains in force today. It bars "[a]ny immigrant who is coming to the United States to practice polygamy." Immigration Act of 1990, Pub. L. No. 101-649, § 601, 104 Stat. 4978 (1990). References to belief or advocacy were deleted. This change indicates that only an individual's objectively observable practices, not his or her subjective beliefs, trigger the polygamy bar. Congress also added a new phrase: "coming to the United States." *Id.* As Al-Hasani argues, this addition shows past behavior elsewhere is not the concern, but rather intended conduct in the United States.

The statute's forward-looking orientation does not help Al-Hasani, however. He contends he did not come to the United States with the intent to practice polygamy, nor did he practice polygamy once here. But he intended to come to the United States, he was married to two women at the time, and he chose to remain married to them in order to provide and

---

[7] Available at https://heinonline.org/HOL/P?h=hein.statute/sal039&i=898 (visited July 10, 2023).

[8] Available at https://heinonline.org/HOL/P?h=hein.statute/sal066&i=209 (visited July 10, 2023).

13

receive the benefits of marriage. So the question is not whether the statute looks forward or backward. Rather, the nub of the issue remains the definition of polygamy. We conclude that Al-Hasani's conduct fits the statutory definition.

Al-Hasani was married to Khalili and Jouni at the same time. While he could not divorce Khalili in Morocco (where she lived) and could not divorce Jouni in Syria (where she lived), he could—and indeed, eventually did—divorce Khalili in New Jersey (where he lived). But, for the five years preceding Al-Hasani's naturalization application, it is objectively clear that he remained in simultaneous marriages. Al-Hasani points to record evidence of the subjective reasons he remained married to both his wives: he did not want to divorce Jouni because she then would be subjected to stigma, and he did not want to divorce Khalili because that would make Khalili's son, A.L., feel separated from his father.

But the ordinary meanings of the statutory terms, together with the statutory history, show that Congress shifted its focus from both beliefs and practices to the sole concern of the 1990 statute: the practice of polygamy. Therefore, we must focus on Al-Hasani's practices, not his subjective reasons for doing what he did. Objectively speaking, Al-Hasani deliberately remained married to both his wives at the same time. He therefore practiced polygamy.[9]

Al-Hasani offers several arguments in an effort to resist this result. He cites *Matter of G–*, 6 I&N Dec. 9, 9–10 (B.I.A.

---

[9] We need not decide whether extenuating circumstances, such as mistake or inability to obtain a divorce, might cause some simultaneous legal marriages to fall outside the definition of polygamy. No such circumstances are present here.

14

1953),[10] where the BIA held the polygamy statute bars the admission only of those who "subscribe[] to the historical custom or religious practice called 'polygamy.'" *Id.* at 11. The BIA explained that "[i]t is not sufficient that an alien should in fact have had more than one spouse at a given time, by virtue of a second marriage undertaken without benefit of divorce." *Id.* Al-Hasani contends this language describes him, so the polygamy bar does not apply.

There are multiple reasons why *Matter of G–* does not compel reversal. Most importantly, agency interpretations do not illuminate Congress's intent in passing a statute where that intent is plain from the text (either at step one of *Chevron* or as part of a non-*Chevron* statutory interpretation exercise). *Port Auth. Trans-Hudson Corp. v. Secretary*, 776 F.3d 157, 161 (3d Cir. 2015) ("[W]hen we are called upon to resolve pure questions of law by statutory interpretation, we decide the issue de novo without deferring to an administrative agency that may be involved." (internal quotation marks and citation omitted)).

And even if we considered *Matter of G–*, it dealt with the 1917 version of the statute, which barred "polygamists, or persons who practice polygamy or believe in or advocate the practice of polygamy." An Act to Regulate the Immigration of

---

[10] The BIA is part of the Department of Justice. USCIS, which denied Al-Hasani's naturalization application and is the defendant here, is part of the Department of Homeland Security. However, "BIA decisions are binding on all DHS officers and Immigration Judges." Board of Immigration Appeals, *in Executive Office for Immigration Review: About the Office*, available at https://www.justice.gov/eoir/board-of-immigration-appeals (last visited June 27, 2023); 8 U.S.C. § 1103(a). So Al-Hasani is correct that, if *Matter of G–* applied here, USCIS would be bound to follow it.

15

Aliens, Pub. L. 64-301, § 3, 39 Stat. 874 (1917). Based on the text and legislative history of the 1917 act, the BIA reasoned the bar applied only to those who believe in the custom or practice of polygamy. 6 I. & N. Dec. at 10–11. As a result, it held the bar did not apply to the appellant, who "stated that he did not know the definition of polygamy; had never before heard the word; and did not believe in having plural wives." *Id.* at 11. This application of the 1917 statute does not help us interpret the current version, which lacks language about subjective beliefs and instead requires consideration of the objective question of whether the individual has "com[e] to the United States to *practice* polygamy." *See* 8 U.S.C. § 1182(a)(10)(A) (emphasis added).

There was also another appellant in *Matter of G–* who thought "that [her] second marriage was somehow valid," even though as a legal matter it was not because she had not divorced her first husband. *Id.* at 13. Because she was not in two simultaneous legal marriages, her situation was quite different from the facts here. In sum, then, *Matter of G–* is irrelevant, outdated, and distinguishable.

Although Al-Hasani portrays his two marriages as simply "successive singular unions without intervening divorce," Appellant's Br. 21, the facts are more complicated than that. Al-Hasani married Khalili and, not long after, was separated from her by the travel ban. He then married Jouni and, not long after, was separated from her by his flight from Syria. But when he arrived in the United States, he petitioned for his first wife, Khalili, to join him—not his second wife. Al-Hasani then lived with Khalili and their son in New Jersey for some time. These were not merely successive singular unions, but alternating relationships with two women to whom Al-Hasani remained married simultaneously. At oral argument, counsel asserted that when Al-Hasani and Khalili cohabitated

16

in New Jersey, they did not live in a marital relationship. Oral Arg. Recording at 6:16–6:31. But this contention—even if it were supported by the record, which it is not—would lead us into a subjective inquiry about whether a particular kind of relationship constitutes a marriage. That approach is not supported by the statute's objective focus. *See* 8 U.S.C. § 1182(a)(10)(A).

Al-Hasani argues he was caught between two good-moral-character requirements: he could not practice polygamy, and he also could not "[w]illfully fail[] or refuse[] to support [his] dependents." Appellant's Br. 28 & n.6 (quoting 8 C.F.R. § 316.10(b)(3)(i)). But Al-Hasani does not explain why he needed to remain married to both wives in order to support both sons. People around the world routinely send financial support to, and remain in contact with, unmarried partners and ex-spouses in order to co-parent their children.

## B. Judicial Notice of Al-Hasani's Divorce

Al-Hasani argues this Court should take judicial notice of the judgment of divorce from his first wife, Khalili, which was granted by a New Jersey court in July 2022 after he filed his notice of appeal in this case. He says he got the divorce because he was "frustrated by the mischaracterization of his situation in the naturalization process and the growing difficulties this was posing." Appellant's Br. 31. According to Al-Hasani, "his divorce further demonstrates that he did not practice polygamy and did not come to the United States to do so." Reply Br. 16.

The Federal Rules of Evidence authorize a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court opinion is the type of source whose accuracy cannot be readily questioned. *S. Cross*

*Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). However, we decline to notice the divorce because it is not relevant to our decision. For one thing, a divorce in 2022 does not change the facts of Al-Hasani's conduct for the five years preceding his naturalization application, from 2012 to 2017. For another thing, while the divorce could be retrospective evidence of Al-Hasani's intent during the five-year statutory period, it might also show simply that Al-Hasani wants very much to naturalize and was willing to end one of his marriages to attain that goal.

Because the 2022 divorce would not change our conclusion about the applicability of the polygamy bar, we decline to notice it. The divorce will, of course, be highly relevant should Al-Hasani reapply for naturalization in the future.

### III.

The good moral character requirement begins five years before the date of the naturalization application. 8 U.S.C. § 1427(a). DHS agreed at oral argument that Al-Hasani is not barred from re-applying for naturalization in 2027, which will be five years after his 2022 divorce. As long as he meets the other naturalization requirements, DHS said, he would be eligible for citizenship. Oral Arg. Recording at 23:09–23:32. While Al-Hasani understandably wants to naturalize now rather than waiting, he is not statutorily eligible at this time. We will therefore affirm.

18